Your Honors, good morning. I'm Clayton McKay and I represent Honor Obrey v. Appellate. I'd like to reserve two minutes of my time for rebuttal. The starting point of this case is the first trial that we had in the Lord Court in August 2003. Prior to the commencement of that trial, at hearings on motions and limiting, the trial court basically gutted the plaintiff's case by excluding all circumstantial evidence which went to the issue of pattern of practice, of discriminatory practices in the promotions at Pearl Harbor Shipyard. Basically, we were seeking to introduce evidence of statistics both at Pearl Harbor and at the other naval shipyards. We wish to admit evidence related to testimony given by the Admiral Nonos, the commander of all the shipyards. He announced the policy and that it was implemented by the four commanders of the various shipyards. The outcome of that policy, not only at Pearl Harbor, but at the other shipyards, that the policy had the endorsement of the headquarters of senior managers at Navy headquarters, and also its impact here at the shipyard. Counselor, let me just, I'm going to cut to the end game on this one for a minute. Let's suppose that Judge Reel committed at least six of the errors that you raised, and in particular didn't, although there were specific witnesses and testimony that we previously addressed, it was clear that the court was accepting kind of the pattern of practice argument and thought evidence should be admitted. Let's suppose Judge Reel committed these errors in the second trial. Were those errors harmless in light of the outcome and the overwhelming evidence on the other side? The test is not overwhelming evidence. The test is as articulated by the first Logan case, which is cited at 400 Fed 3rd 691. The court in that case, the panel in that case, not only ruled that the evidence that the exclusion was improper, but also articulated the law and corrected the split jurisdictions, I believe, that had been existent in the Ninth Circuit and articulated that the presumption goes that there is error and that the beneficiary of that error should bear the burden of showing that it was harmless. The presumption is that there is harm. And then the other side has to show that it was harmless. It was harmless. It didn't affect the outcome of the case. That's correct. OK. Basically, the Ninth Circuit in that case, in the previous Logan case, basically reconciled the two lines of cases and said, basically, we will presume error or presume harm consistent with the Supreme Court's holding, which was cited. Well, we have a different record now, though. Well, we have a different record, but the same problem. We have the problem that the trial court the second time around refused to implement. Specifically, the decision of the Ninth Circuit in the three points of evidence that we raised before below. Statistical evidence had been ruled to be relevant, but yet the trial court denied the testimony, would not allow the expert to testify as to what happened when there were qualified applicants. They all have applied, but the qualified applicants were non whites and there was no non. So there was no selection done. The expert articulated that non-whites had a greater propensity to be part of that sort of event where there was no selections being made. Yet there were qualified applicants who had submitted their applications. The trial, the appellate court had ruled that Ben Toyama should be permitted to testify that the Navy's justification of importing outside workers into Pearl Harbor was pretext. The trial court at the second trial denied that evidence would not allow Mr. Toyama to testify. At all. At all. Well, he allowed him to testify, but not on that point. I thought the thing that he wasn't allowed to testify on was the budgetary impact of hiring practices. Well, he would not let him testify. He thought that the reasons for bringing in these for bringing in outside workers was pretext. And he would have articulated why he felt that it was. What did Mr. What did Mr. Toyama testify then? He only testified that there were comments made about the racial makeup of the shipyards, Pearl Harbor shipyards. So Judge Real did let all that in. He let it in. He only let in one part of the two part that the Ninth Circuit had said that Mr. Toyama should be allowed to testify. And so he let him be part about the statements made to him by the shipyard manager and the shipyard controller. But he did not allow in the second prong of this testimony. And that was the Navy had brought in these outside workers. And there was no justification that the reason that the Navy had articulated for bringing in these outside workers was pretext. And why did. Well, that's conclusionary. What did Mr. Toyama know that allowed him to testify? Because he had access to one, his conversations with Mr. Malachi and Mr. Matsumoto. So he had. Well, did they say we're doing this as a. This is all pretext that they weren't showing up on the books. And that's the budgetary impact of that practice. That's what was excluded. That's correct. Can you describe for me precisely what the budgetary impact was to which Mr. Yes. The Navy had articulated that the importation of the outside workers was affecting a greater efficiency in the budgetary in accomplishing a mission, a overhaul of a vessel and that they were bringing and they were doing that with these outside workers had a greater efficiency than because they did not cost as much as the Pearl Harbor. They didn't cost as much. They didn't pay them as much. They weren't they weren't going over budget. But what had happened was these workers were not charged to the shipyard's account. They were charged to a training account maintained by headquarters. That's all true. But Judge Real said on the matters of budget, he's not competent to testify to that. But he says he has not been qualified to be able to testify. That's purely opinion. He was qualified to testify as to what Malakwe and what Matsumoto had shared with him when they acknowledged testified to that. But he didn't testify on the budgetary stuff. That was a motion to eliminate. This was this was, I think, completely different than the first time it came up. No, I don't think he's on budgetary stuff. Didn't come up, did it? The budgetary issue did come up and it's so cited in the motion. Motion to eliminate the rulings of motions eliminate not addressed by the Ninth Circuit. Those matters, they're the rule of the case. The court's ruling here granted defendants motion to eliminate is different. Well, that is the problem we have in this case, Your Honor. And that is on the first appeal, all seven exclusions were raised on appeal in the open brief. I'm having trouble understanding even if that testimony about budgetary practice and consequence had been admitted, how that would have been helpful to you. Just to say the Navy's appears to be a very good case.       It's a good case. It's a good case. It's a good case, Your Honor.     The last one. I don't think Mr. Wanted to testify. I listened. It was cheaper to bring him in because it was coming out of another account. And Mr. Toyama would have testified the way. This is not you coming out of another account. That's correct. What account? As admitted by Mr. Malachi, Mr. It was coming out of an account that was not charged to the shipyard. In other words, Mr. Toyama would have said it was coming out of an account not charged to the shipyard. Because he would have been reciting the testimony or the comments made to him by Mr. Matsumoto and Mr. Malachi. That was not permitted. But I cannot see how that helps your client. Standard bureaucratic behavior to try and lay off costs on some other some other budgetary line. Yes. This is to my advantage. If I can lay off costs under some other account. You're correct, Your Honor. But if the persons that are coming in are are imported and they come in, they remain here, they take. And they also compete for the managerial jobs. And because of the selection process, they are given preference over the local. Right. But that may be a bad reason. And this is an internal bureaucratic sort of monetary scam reason. But that's not a discriminatory reason. Except the other evidence that we sought to get admitted that was not permitted was one of the deposition transcript of who at the time that he gave that deposition was the former commander of the entire shipyard. But he testified that earlier while he was the shipyard commander of the entire four Navy shipyards, he directed his shipyard commanders to implement this policy. And then we also had evidence that showed the how that policy was articulated and how it developed. We had evidence as found on page 17 of our opening brief that basically you had 31 persons being promoted in the other shipyards who had been non shipyard who were outside of the shipyards when they got higher. Of the 31, 25 of them were white shipyard managers. So you have a disparity of. In the actual implementation at the other shipyards or a preferential treatment that are fused on the surface, that the white managers or the white applicants were given preferential treatment. And additionally, Admiral Nanas would have testified that he was aware of the go back to this budget thing. So. So you're my understanding. Mr. Toyama's testimony was that the Navy gave this extensible reason which justified bringing in offshore hires, which was it helped them with budgeting. Mr. Toyama was supposed to be the witness that said no. Budgeting was a pretext. There was another real reason that had nothing to do with budgeting. What was that reason? What was he going to testify? They wanted to bring in other workers from the other shipyards. And it was basically importation. He would testify that it was race based. He would testify that the persons that came from the other that came from the outside were primarily white. And they are the ones that took over the manager, you know, management positions, as well as the upper management position. When there was no need to. And his testimony was based on observation, observations, as well as his discussions on the issue with Mr. Malacue, Mr. Matsumoto. And they told him that it wasn't really about the budget. They told him that the budget were not being charged to the shipyard budget. It came out in e-mails that had been shared to and from Mr. Matsumoto and Mr. Toyama and Mr. Toyama and Mr. Malacue. Well, he brought the issue to them. Did Judge Real allow those e-mails in? Pardon? Did Judge Real allow the e-mails in? He did not allow, he excluded. Additionally, the Ninth Circuit had held in the previous case that anecdotal testimony would be permitted, specifically the testimony of three other shipyard employees who had themselves applied. I read the testimony that Judge Real, if I can call it testimony, I read what Judge Real read to the jury. Putting to one side the question as to whether or not he should have allowed them to testify in person, which I will say only for myself at this point, I think he made a mistake. I think he should have let them testify in person. But I'm trying to figure out what was lost by reading these statements rather than allowing them to testify. What's the difference? What would have been better for you had they been allowed to testify in person? The jury would have had the opportunity to assess the credibility of these witnesses. They would have been able to hear the testimony of Mr. Teising and Mr. Pestada, that the person that took the position that they were seeking for was not qualified at the time that he took the position. This is Mr. Campbell, right? No, this is Mr. Teising and Mr. The person who got the position instead of him, wasn't it? Wasn't his name Campbell? No, that was another position. I'm sorry. They would have, Mr. Pestada and Mr. Teising would have testified that they both competed for the same position at the shipyard. Correct. The person selected for that position was a white manager from Chiefs of Sound. That person, because of his time and grade, did not have the qualifications to fill that position. Both Mr. Teising and Mr. Pestada was aware of that, sought to bring it to the attention of the Navy. The Navy overlooked it. And this individual who was clearly not qualified was able to remain in that position. Additionally, Mr. Kawachi would have testified that he had on three occasions been rated as very well qualified. He had made the selection process. But he and other non-whites were on the application list. I'm sorry. It was Mr. Armstrong rather than Campbell, right? The selections were not. That's correct. The selections did not count. So you not only have the district court violating the rule. So we have a description, a very brief description. And what Jadriel read to the jury of Mr. Armstrong's sort of academic qualifications. He doesn't say one way or the other as to time and grade. That's correct. In preparation of his statement, was that not put in? Well, we object. We raised that issue. And the judge simply decided that it was not relevant. And that was the problem. Instead of allowing that kind of decision to be made in open court in front of a jury. Basically, we had a judge not only cited relevance. He also decided credibility. He would not allow the jury to decide that. Finally, we have the issue of the court. Despite the offer of both parties of an exploitive jury instruction denied that. And we submit that that was error. It was not a mixed load of jury instruction. It was the it was the it was the verdict form. This verdict form as well as the jury instruction. But as I read the jury instruction as a whole, mixed motive shows up in the instructions. The problem is that it's not there in the form. It was not there in form. But then it was not a the motive shifts the burden. Basically, if we can show that race had a was a motivating factor, then the burden is shifted. And that was not there. Right. That's a separate instruction than the one that does talk about a motive. That's right. Entirely separate. All right. You're over your time. So we will hear from Mr. Ching. Good morning. May I please the court. Assistant United States Attorney Edward Ching for defendant of the League of United States of America. Your Honor. Mr. E.K. has misstated the scope of the Ninth Circuit's original opinion in this case. Four hundred after six nine one. With regard to the with regard to Mr. Toyama's testimony. The Ninth Circuit only addressed whether shipyard officials, namely Matsumoto and Malakai, made statements that local people were not good enough. The Ninth Circuit did not, in its opinion, address the budgetary issues that Mr. E.K. has. If you read the opinion, though, I read it again last night. It's a yeah. The opinion addresses these specific issues. But it also you can read it more broadly to say, you know, that he raised his factual issues, whether there was a pattern of practice of such disparate treatment. And if so, whether the differences were racially premised. And under that, a whole lot of testimony that maybe the court didn't specifically address in this opinion. But it would be relevant in including it would be relevant if if you followed the general law that's sort of articulated in, I think, was judged by this opinion. Let me assure the government's position is that it was a very narrow ruling. However, if that is the case of prior to the second trial, the government did take Mr. Tama's deposition and this was spelled out in our motion to eliminate. Mr. Tama professed that he had no knowledge as to the budgetary processes as to the shipyard. And that's what the motion in the minute was directed to. Yes, Your Honor. And even even if so, even after the ruling, I believe that Mr. E.K. could have put Mr. Tama on the stand. And, you know, out of the presence of the jury discussion to establish that he had budgetary knowledge of the shipyard. There was no evidence set forth with regard to his knowledge of the budgetary processes. More so, Your Honor, Mr. Toyama was not listed as an expert in his final naming of witnesses as with regard to his testimony as to the budget. Moving on. Wasn't that though? I mean, OK, let's assume Mr. Toyama knows nothing about the budgeting process for the Navy. But he wasn't allowed to testify. It was after now. I'm sorry. NASA Meadow. And now I like why. Sorry that they were able to deny Toyama's statement that they each had acknowledged that there was really racial bias going on. And then Judge Real cut off cross-examination at that point and didn't let them, didn't let Apprentice Council go into all of that underlying thing in the e-mails and what was really going on. Your Honor, Mr. Malakwa and Mr. Massimone were both called by the government, I believe, as witnesses to testify solely on the issue set forth by the Ninth Circuit. Whether they made comments, for example, that local workers were not good enough or the people here are not good enough, something to that effect. Mr. Ike then called, then tried to present cross-examination outside the scope of direct. I believe that that was Judge Real's ruling. Your Honor, if Mr. Ike wanted to pursue those matters with them, he could have called them as his experts. In addition, Your Honor, I could not to this date figure out what the purpose of trying to cross Mr. Malakwa and Mr. Massimone with those documents were. I believe that that was improper cross-examination. For example, if it was a statement, an e-mail from Mr. Massimone saying, dear Mr. Toyama, the local workers are good enough, then you could use it to impeach him. To this day, I cannot figure out the basis for Mr. Ike's decision to try to impeach or try to use these documents to cross-examine Mr. Massimone and or Mr. Malakwa. It was not an excited utterance or any other type of exception to the hearsay rule. Your Honor, I'd like to just briefly go back to the Ninth Circuit ruling. The Ninth Circuit ruling did reference Mr. Danmiller's statistical evidence at the trial. Judge Real allowed Mr. Danmiller to testify. It appears that Mr. Ike has objected to the fact that Mr. Danmiller was not allowed to address the instance or the situations in which a position was opened, and that he was not allowed to address the situation in which a position was opened.  It was a job selection that people applied, and then the job selection was canceled or temporarily delayed. However, Your Honor, if you look at Mr. Danmiller's report, Excerpt from the Record 1093, in a footnote, it states that he did not do any analysis of any situations in which positions were opened, candidates applied, and no selection was made. That was my opening brief, Your Honor. And in that case, it would not be proper for Mr. Danmiller to testify about something that he did no analysis of. He did not include that analysis in his report, and it would be improper for him to testify as to that issue at trial. That would be trial by ambush. Your Honor, also with regard to the three employees, I just want to point out that the original Ninth Circuit opinion in this case, in the Obrey case, still gave, or it reserved the right for Judge Real to actually exclude the evidence of these three employees, and that that was the government's original position in our motion limiting. I understand what Your Honor has said about that. You might have made a mistake with that issue. However, as my motion eliminating detailed, the amount of witnesses, the amount of documents that would have been introduced had these three employees been allowed to testify. And, Your Honor, that actually took up one volume of my five volumes. But, frankly, I've never heard of the government, I mean, the district court editing the testimony of a witness and then reading it himself. I've never heard of that. I've never seen that in any other appeal, and as a former district court judge, I wouldn't remotely think of doing that. Your Honor, I was actually looking for a case law, and I couldn't find any cases. And that's why, in my brief, I just attacked the case law that Mr. Vickade, you know, that Professor Jarvis' case. Did you suggest this as a way of handling this, or was this the idea of the district judge? Your Honor, I was in on the conference call, and I believe that Mr. Vickade can correct me. I believe that Judge Real had suggested it. Actually, what happened was it was our position was that these three employees' testimony should be excluded, based on the fact that it was two different positions. I believe Ticey and Pistano were going for a SRA position, GS-15. But they weren't substantially similar, similarly positioned, and therefore it wasn't relevant. Well, the judge obviously didn't agree with you on that. He obviously thought that somehow it was relevant, but then he decided to just do it in his own way. Your Honor, I think what the judge, I can't say what Judge Real was doing, but it was, according to the people at our camp, we, the way we saw it was that the Ninth Circuit gave him a roadmap by saying, look, you shouldn't have cut out these three witnesses' testimony. However, there's, quote, unquote, less restrictive means in which you could do it. Even if Judge Real had allowed these three employees to testify, it would have been, I mean, the length and the information would have dwarfed the claims in this case. Your Honor, in the case law set forth by Mr. Ekay and also cited by Mr. Hain in the Hurley case, those were also cases in which testimony of employees were presented. However, in those cases, those cases involved sexual harassment cases where a co-employee would say, yes, I was also sexually harassed, perhaps I was grabbed, or somebody made comments to me. In this case, you would have to bring in not only the three employees, you would have to bring in the selection panel members, you would have to bring in the selecting official, and you might even have to bring in any other type of employees who weeded out any type of their applications. But I guess, no, I mean, and I think it's in part already answered by the panel opinion the first time this case came up, which is to say it seemed us wrong to exclude it. Now, maybe on remand there'd be some way to go at this, but if this is not a pattern or practice case, and the pattern or practice case dropped out the first time around, it does not appeal, so this is not pattern or practice, nonetheless, it's relevant to an individual discrimination claim as to whether or not he can point to other instances in the yard, and then you're really between a rock and a hard spot. And your position seems to be that you can't get any of that in there. I think that's inconsistent with what that first opinion was, and it's inconsistent with how one would ordinarily look at trying to figure out what's true or not. Your Honor, that is our position, and I understand that Judge Riel tried to do something, quote, unquote, less restrictive. I think he recognized the fact that if he did put on all these witnesses, it would have just worked this case, and it would have confused the jurors. Can you address the specific question, and I misstated, it's Mr. Armstrong. Yes. Mr. Ekay has said that if the witnesses had been permitted to testify, they would have said that he was not qualified, that he didn't meet the formal requirements for the job in time and grade. Is that true? Yes, Your Honor. I think what happened was. That is true? Qualified in respect of whether he had sufficient time in a particular position. I think with regard to the issue of whether. Was that part of the formal job description when it was advertised? Yes, Your Honor, I believe so, and I believe that the accusation is that the job process was stretched along to allow Mr. Armstrong to receive that position. However, Your Honor. I want to make sure. Stretched out in order for him to achieve the time and grade, which would then qualify him, or are you saying. I'm trying to understand what you're saying to me. Yes, Your Honor. I believe, for example, it said you have to have, let's say, 10 years in a certain position, and maybe he was a few months short, so I think the allegation was that they stretched out the process. They gave him the 10 years? Yes, so that he would get 10 years. However, Your Honor, I believe Mr. Armstrong, who was applying for the SRA position, was actually holding, or he held that position at a different shipyard, so it's not that he wasn't qualified as to being able to perform the job. I think it was just one of these bureaucratic type. Yeah, but that strikes me as entirely irrelevant. I mean, if you're letting these people come in and say, well, I should have got the job instead of Mr. Armstrong, instead of saying Mr. Armstrong had a master's degree in business administration, which is stated here, it seems to me highly relevant to figuring out whether he really was qualified or whether there really was discrimination. Well, he didn't meet it, but they dragged him out more so they could give him the job. Yes, Your Honor, and I just want to expand on that issue with regard to Mr. Armstrong, is that Mr. Picey or Pistano would not be qualified to testify to these issues. The person who would be qualified would have been Mr. Allison  Ms. Shigemasa was not on Mr. E.K.'s witness list, so even if the judge had said, you know, we'll open this up, they can testify. At the time where he called Mr. Picey and Mr. Pistano, I would have objected based on the fact that they had no personal knowledge, and if he had tried to call Ms. Shigemasa, I would have objected based on the fact that he was not on the witness list and it was trial by ambush. I have one question. Yes. On page 57 of your brief, you say the evidence presented by Plaintiff failed to establish the prima facie case of discrimination. Plaintiff relies on a flawed statistical disparity, whose effectiveness was challenged by this court. What does that mean, whose effectiveness was challenged by this court? I believe in the original decision by the court, I think there were comments, and I didn't highlight it with regard to whether there was no reference there, so I wasn't sure exactly what you were talking about. Yes. So what are you talking about? I think I was talking about that in the original opinion, that there was a reference to the fact that this type of statistical analysis is not the strongest.  In your honor, I really, I don't have, I should have stated that, and I don't have the exact point in this, in my copy of the opinion. In this appeal, Obrey claims the district court abused its discretion, failing to admit three pieces of evidence. One, a statistical report showing a correlation. Addressing such evidentiary rulings in turn, we find that the district court's decision excluding this evidence was an abuse of discretion as to all. So where's the part challenging it? Your honor, I'm going to page 696 on the original opinion. 696. Yes. Quote, in some cases, statistical evidence may suffer from serious methodological flaws and can be excluded, consistent with the trial court's gatekeeping power. In some cases? In some cases, yes. Now I'm going down to 696, head notes three and four. Hold on. I'm sorry. 696. It's right after footnote three on my Westline. I don't know if you have the copy with the head notes. It's head notes three and four. Here, the Dan Miller study is based entirely on statistical disparities. Yes. Well, we and other courts have commented on the inadequacy of such studies. We've typically done so in the context of finding insufficient evidence to support a prima facie case of discrimination. Yes. So it was based on the comment that, you know, there was a comment that, you know, it could be found inadequate at times. I think, your honor, I apologize for not citing that. Not to rule that these studies are admissible. Yes, your honor. So I think I was attacking the weight of the study. And I think I know I'm running out of time now, your honor. I did. But some Dan Miller study was relevant. Yes. Yes, your honor. Judge Reel did allow Dan Miller study to come in. He didn't let other parts of it come in. Yes, your honor. The part that he did not let come in, we believe. Was the part that the Ninth Circuit didn't specifically address. I mean, I have some sympathy for the government's position in this case. And I know you were trying not to create an error that would cause reversible error so that this case might not be tried for the third time. But some of these rulings do seem quite a bit at odds with the Ninth Circuit opinion that we previously issued. Yes, your honor. I just want to point out one thing is that with regard to Mr. Dan Miller, one of the things, or the only point that Mr. E.K. brings up is that the instance in which a selection was not made after it was advertised. And once again, your honor, you know, he waives any other error that he has with Judge Reel's ruling as to Mr. Dan Miller. But however, the point that he's bringing up was something that Mr. Dan Miller never did. So, you know, if the judge, if that was with regard to the situations in which selections were open, I mean, the job was open, selections were never made, Mr. Dan Miller never analyzed those situations. And that's the only point, I believe, of error that Mr. E.K. brings up with regard to the court's handling of Mr. Dan Miller. In his opening brief, your honor. I don't remember it exactly like that. I think there was some other issue that he, I think it had to do with the other naval bases. Oh, I'm sorry. Okay. I'm sorry, your honor. With regard to the other naval bases, your honor, that was a point, and I think that's what you're just trying to tell me, was that that was raised on the, that was raised during the first appeal, and that was not disturbed by the Ninth Circuit. So, you know, that was part of our law of the case motion. It wasn't even discussed by the Ninth Circuit. I mean, that's the point on this opinion. Anyway, we're way over time. Yeah, but if, your honor, just 15 seconds. I guess the hard part that the government saw in this case was there were a lot of points that were not addressed. So, you know, the government's position was that unless Mr. E.K. could bring new evidence to show why Judge Rial should go differently, you know, everything should stay in place. All right. Thank you, counsel. You went over time, but so did the government. So I'll give you one minute. I will try to be as fast as I can. With respect to the claim that I misstated the ruling of the Ninth Circuit with respect to Mr. Toyama, I would refer to page 790, 697 of the Ninth Circuit ruling in which the Ninth Circuit specifically stated that Toyama's testimony was also relevant as to whether Navy's proffered race-neutral reasons for preferring off-yard workers was a pretext for unlawful race discrimination. Additionally, I would like to point out that in as indicated by the docket on May 25th, 2005, the government filed a motion eliminating regarding rulings on motions, eliminating not addressed by the Ninth Circuit. What they were basically seeking to do is all those evidentiary rulings, the Ninth Circuit had ruled that pattern of practice evidence was relevant and that it was abuse of discretion to have refused that. And because the Ninth Circuit only directly touched upon three pieces of the pattern of practice, that the other patterns of practice evidence should not be admitted. And that's what the trial court grabbed on and saying that despite the law of the case, despite the rule of mandate and despite the inconsistency of its rulings with the Ninth Circuit ruling, that it was still going to sustain its prior rulings on the other pieces of evidence. In your blue brief, what do you complain about with respect to what the trial court did with Mr. Dannemiller's testimony? We I can't. With respect to the Mr. Dannemiller, what had happened was he submitted a report. That report did not just specifically address the issue of whether his analysis of the or his numbers, of the fact that the non-whites were predominantly were more likely to come up on those situations in which the non-whites were more likely to come up on those situations in which the non-whites were more likely to come up on those situations.  The non-white applicants that qualified applicants had applied, but no selection was made. He didn't touch on that at all. He didn't touch upon that specifically in his report. Right. But he did testify at the Daubert hearing that he did consider it. And that was, in his mind, part of the overall analysis. And that is what he testified at the Daubert hearing, that he did consider it. He just didn't reference it specifically in his report. All right. Thank you, counsel. Overy v. England will be submitted and the session of the court is adjourned. Thank you.
judges: Trott, Wardlaw, W. Fletcher